# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

|  |  |  |  |
|---|---|---|---|
| MARIA N. VINSON, | ) | | |
| | ) | | |
| *Plaintiff*, | ) | CASE NO. | 2:12-cv-01088-BJR-SRW |
| | ) | | |
| *v.* | ) | | |
| | ) | | |
| KOCH FOODS OF ALABAMA, | ) | | |
| LLC, *et al.*, | ) | | |
| | ) | | |
| *Defendants*. | ) | | |
| | ) | | |

## I.      INTRODUCTION

Plaintiff Maria N. Vinson brings this employment discrimination action against Defendants Koch Foods, LLC,[1] Koch Foods of Alabama, LLC ("Koch"), and David Birchfield.  Plaintiff asserts discrimination claims under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, based upon her race and national origin.  Before the Court is Defendants Koch and Birchfield's Motion for Summary Judgment.  (Doc. No. 75).  Having reviewed the parties' submissions, the record, and the relevant legal authority, the Court will GRANT Defendants' Motion for Summary Judgment.[2]  The Court's reasoning follows.

## II.      BACKGROUND

### A.  The Parties

Plaintiff Maria N. Vinson is a United States Citizen of Puerto Rican origin.  (Doc. No. 77-1, Vinson Dep. 257:9-12, Sept. 9, 2015).  Vinson's parents are Puerto Rican, and Vinson lived in Puerto Rico for approximately 16 years.  (*Id.* at 256:14-19; 257:9-12).   Vinson is fluent in both

---

[1]      On November 16, 2015, Defendant Koch Foods, LLC separately moved for summary judgment, seeking that the Court dismiss all claims.  (Doc. No. 73).  In response, Plaintiff agreed to dismiss Defendant Koch Foods, LLC as a named defendant.  (Doc. No. 112).  Accordingly, the Court dismisses Koch Foods, LLC from this action.

[2]      The Court grants Defendants' Motion for Summary Judgment for all claims brought against Defendants, including those brought against Defendant Birchfield in his individual capacity.

Spanish and English, and she considers her national origin to be Puerto Rican.  (*Id.*; *see also* Doc. No. 77-4, Vinson Resume).  At the time Vinson initially interviewed with Koch, she held an Associate's Degree in Communications and certifications in Computer Technology and Broadcast Journalism.  (Doc. No. 77-1, Vinson Dep. 69:15-70:22; 71:19-72:11).  Vinson completed her Bachelor's Degree in Human Resources in May 2012.  (Doc. No. 115-5, Vinson Decl. ¶ 9).

Defendant Koch is a chicken processing facility in Montgomery, Alabama.  Koch is comprised of three facilities: the kill plant, the debone plant, and a hatchery.  (Doc. No. 77-2, Rule 30(b)(6) Dep. 79:8-80:3, Sept. 16, 2015).  The kill and debone facilities have stand-alone Human Resources ("HR") departments, each with its own manager who reports to Defendant David Birchfield, Koch's overall Complex HR Manager.  (Doc. No. 77-1, Vinson Dep. 173:19-174:8).

    *B.  Factual Background*

       1.   <u>Vinson's Employment with Koch</u>

In 2009, after learning through a temporary staffing agency that Koch needed a bilingual employee for its HR department, Vinson applied for a position at Koch.  (*Id.* at 50:16-21).  According to Vinson, she interviewed with Birchfield who informed her that her title would be "Orientation Trainer" and that her responsibilities would include working with new hires.  (*Id.* at 51:11-14; 51:22-52:13).  On October 6, 2009, Vinson began work as a temporary employee at Koch's kill plant.  (*Id.* at 65:11-14).  On or around January 29, 2010, Vinson became a permanent employee at Koch.

Vinson was initially assigned to work in the HR department at the kill plant as a New Hire Orientation Clerk and Translator.  (*Id.* at 297:23-298:18; *see also* Doc. No. 77-3, Collins Dep. 41:6:-10, Sept. 11, 2015).  Vinson's responsibilities included processing new hires, translating, issuing and verifying identification cards and documents, completing federal forms for all

personnel, conducting personnel drug screening, maintaining personal attendance records, and assisting with payroll.  (Doc. No. 77-1, Vinson Dep. 58:20-61:12; 66:20-22; 92:7-97:13; 98:5-105:11; 106:12-107:11).  Additionally, Vinson conducted orientation tours, providing new hires with information on how the facility processed chickens.  (*Id.* at 53:12-54:1; 56:5-21).

### 2.    Koch Promotes Lindsey Johnson and Mason Melton

#### a.    *Promotion of Lindsey Johnson to the Professional Trainer and Developer Position in 2011*

In November 2010, a little over a year after Vinson began working as a temporary employee at Koch, Birchfield hired Lindsey Johnson to work as a paid intern in the HR department. (Doc. No. 77-6, Johnson Dep. 38:12-20, Oct. 19, 2015).  As an intern, Johnson observed disciplinary meetings, audited personnel files and policies, drafted an employee handbook, and created training checklists.  (*Id.* at 39:17-41:9).

During her internship, Johnson observed that upper-level management at Koch needed professional training and development on conflict resolution.  (*Id.* at 159:21-160:14).  As a result, Johnson conceived of a new position, a Professional Trainer and Developer ("PTD"), to achieve that end.  (*Id.*).  Johnson approached Birchfield with her idea, and once she obtained approval from Birchfield, she pitched the idea to David Massey, Koch's overall Complex Manager, and Bobby Elrod, the Director of HR.  (*Id.* at 160:1-14; 162:14-163:1; 168:21-169:6; 170:15-18).  Massey and Elrod approved, and Johnson, working alongside Birchfield, finalized the job description for the new position.  (*Id.* at 171:7-15; 173:3-9).  The description stated that the PTD position required a Bachelor's or Master's degree in Business Administration and Management, Human Resources, Industrial/Organizational Psychology, or other related field, and a minimum of 2 years work experience.  (Doc. No. 115-11, PTD Job Description).

3

On March 25, 2011, Birchfield sent the PTD job description to HR managers.  (*Id.*).  On that day, Ken German, the HR manager for the kill plant, emailed the PTD job description to Vinson.  (*Id.*).  Vinson applied, signing the bid sheet,[3] along with Patrick Rinn, Issac Galloway, Mike Hughes, and Mike Westhoff.  (Doc. No. 77-1, Vinson Dep. at 136:8-20).  German then interviewed each candidate on the bid sheet, and conveyed his impressions to Birchfield.  (Doc. No. 77-7, German Decl. ¶ 6).  Although Johnson did not sign the bid sheet for the PTD position, Birchfield, and possibly Elrod, interviewed Johnson.  (Doc. No. 77-6, Johnson Dep. 189:16-190:3).  Prior to posting the PTD position, Birchfield had determined that Johnson would be the best candidate for the job because "Johnson had the vision to create the position and had shown the initiative and ambition to develop and sell the idea to management."  (Doc. No. 77-8, Birchfield Decl. ¶ 4).  After the candidates were interviewed, Birchfield selected Johnson for the following reasons: (1) Johnson's "insight and initiative;" (2) Johnson's education; and (3) Johnson's interpersonal skills and professionalism.  (*Id.* ¶ 6).  Johnson held the PTD position from April 2011 to December 2011.  (Doc. No. 77-6, Johnson Dep. 194:9-18).

> ### b.  Promotion of Mason Melton to the Professional Trainer and Developer Position in 2012

Mason Melton started at Koch on June 22, 2010 as an HR Generalist on the night shift.  (Doc. 77-17, Melton Decl. ¶¶ 2-3).  In 2011, German resigned as the HR manager of the kill plant, and Shawn Collins, the HR manager of the debone plant, assumed German's position, leaving the HR manager position at the debone plant open.  (Doc. No. 77-3, Collins Dep. 27:11-16).

---

[3]     Koch filled vacant positions by requiring interested employees to sign a bid sheet.  (Doc. 115-4, Phillips-Velez Dep. 88:7-93:14, Oct. 23, 2015).  While it was generally understood that an individual who failed to sign a bid sheet for the relevant position would not be considered, it is unclear from the record whether Koch *always* required employees to sign a bid sheet to be considered for a position.  (*Id.* at 91:2-93:14).  As discussed below, the Court need not resolve this issue.

Melton, along with Johnson, applied for the open HR manager position at the debone plant. (Doc. No. 77-17, Melton Decl. ¶ 4).  After Johnson was selected, Melton notified Birchfield that he was interested in the now-vacant PTD position.  (*Id.* ¶ 5).  According to Vinson, she does not recall if the PTD position was posted; however, she was aware that the PTD position became open because she was knew that Birchfield promoted Johnson.  (Doc. No. 77-1, Vinson Dep. 217:5-20). Vinson, however, cannot recall whether she applied or expressed an interest in the position to anyone.  (*Id.* at 217:21-218:2).  Birchfield ultimately selected Melton for the position because of (1) Melton's extensive experience in management; (2) Melton's prior experience developing and implementing a company-wide safety training program; and (3) Melton's professionalism.  (Doc. No. 77-8, Birchfield Decl. ¶¶ 9-10; *see also* Doc. No. 116-4, Melton's Resume).

### 3.    Koch Suspends Vinson, Mitsi James, and Heather Bowen

On Thursday, January 5, 2012, Mitsi James, an HR Generalist, Heather Bowen, an HR Specialist, and Vinson were the only employees working in the HR Department at the kill plant. (Doc. No. 77-1, Vinson Dep. 168:16-170:22).  Bowen and Vinson asked James, the senior HR person in the department, if they could visit a co-worker in the hospital.  (*Id.*).  James approved the request, but clocked out shortly thereafter leaving the HR department unattended.  (*Id.*).  Once the women returned, Birchfield placed all three on suspension pending investigation.[4]  (*Id.*).  He informed all three women that he would call them to advise them whether or not they were terminated.  (Doc. No. 77-9, Birchfield Dep. 113:7-11).

---

[4]    Defendants contend that it has a policy that precludes an employee from a promotion when that employee has been formally disciplined within the preceding six months.  (Doc. No. 77-8, Birchfield Decl. ¶ 12).  Vinson argues that Defendants inconsistently apply this policy, and claims that Koch promoted Bowen despite having suspended her in the preceding six months.  (Doc. No. 119, at 59).

In addition to filing their Reply Brief, Defendants moved for leave to supplement its evidentiary submission with the "Personnel Action Form" of Heather Bowen to support its argument that Bowen was promoted six months *after* her suspension.  (Doc. No. 179).  Plaintiff opposed that Motion.  (Doc. No. 187).  For reasons discussed below, the Court need not resolve this dispute.  The Court thus denies Defendants' Motion for Leave to Supplement its Evidentiary Submission in Support of its Motion for Summary Judgment, (Doc. No. 179), as MOOT.

On Friday, January 6, 2012, Bowen called Birchfield and asked for her job back.  (Doc.
No. 77-12, Bowen Decl. ¶ 10).  Bowen returned to work on Wednesday, January 11, 2012.  (*Id.*).
On Tuesday, January 10, 2012, Birchfield contacted James, and requested that she come in to meet
with him and Collins, the HR manager at the kill plant.  (Doc. No. 77-15, James Employee Warning
Report, Jan. 5, 2012).  James returned to work on Wednesday, January 11, 2012.  (*Id.*).

Vinson came into the HR office on Monday, January 9, 2012, to collect her personal
belongings after no one returned her calls.  (Doc. No. 77-1, Vinson Dep. 178:18-23).  On Tuesday,
January 10, 2012, Birchfield contacted Vinson and asked her to meet that afternoon.  (Doc. No.
77-14, Vinson Employee Warning Report, Jan. 5, 2012).  According to Vinson, in that meeting,
Birchfield informed Vinson that he had to speak with Elrod, the Director of HR, before he could
permit Vinson to return to work.  (Doc. No. 77-1, Vinson Dep. 183:16-184:8).  Additionally,
according to Vinson, Birchfield indicated that her direct supervisor at the kill plant, Collins, would
call her by the close of business to inform her if she was terminated.  (*Id.*).  Vinson did not receive
a call that day.  (*Id.*).  As a result, Vinson called Collins on Wednesday, January 11, 2012, and
Collins informed Vinson that she could return to work on Thursday, January 12, 2012.  (*Id.*).  Koch
paid Vinson for the same amount of hours that James and Bowen worked on Wednesday, January
11, 2012, despite the fact that Vinson returned to work one day later.  (Doc. No. 77-16, Email from
D. Birchfield, Jan. 12, 2012).

### 4.   Birchfield Reassigns Vinson to the Production Floor

After her suspension, Birchfield changed Vinson's job responsibilities.  According to
Vinson, Birchfield told Vinson that he wanted her to work with new hires on the production floor.
(Doc. No. 77-1, Vinson Dep. 185:16-186:8).  Birchfield instructed Collins to ensure that Vinson
learned all of the production line duties and to remove Vinson's computer and workstation from

the HR office.  (Doc. No. 77-3, Collins Dep. 172:14-177:4).  Birchfield did not advise Collins to

do the same with James or Bowen.  (*Id.* at 177:5-19).

Between February and April 2012, Vinson learned all 23 production line positions.  (*Id.* at

184:6-8).  Once she completed the training, Birchfield raised Vinson's pay from $11.64 to $14.00

an hour.  (Doc. No. 77-1, Vinson Dep. at 189:1-11).  When asked about her responsibilities on the

production floor, Plaintiff responded as follows:

> I was with the employees hands-on.  I would observe and make sure that they were
> doing the job that they were assigned to do.  I would ask them if they had any
> questions . . . I would ask them questions how they're feeling, and I would just stay
> there with them for half an hour, an hour to make sure that they were – that they
> were doing the process as they were instructed they were supposed to do it.

(*Id.* at 57:1-21).  No job description or posting for a production floor trainer existed prior to

Birchfield informing Vinson that she would assume this role.  (Doc. No. 77-3, Collins Dep. at

59:19-60:9).  This job did not exist on any organizational chart or at any of the other plants.  (*Id.*).

5.   Koch's Termination of Vinson

In late April 2012, Collins took a leave of absence, and as a result, Melton checked in with

employees in the HR office at the kill plant.  (*Id.* at 199:4-16; *see also* Doc. No. 77-17, Melton

Decl. ¶¶ 10-11).  In doing so, Melton observed, and thus reported to Birchfield, that Vinson was

spending more time in the HR office than on the production floor.  (Doc. No. 77-17, Melton Decl.

¶ 10).  Other Koch employees also observed Vinson spending more time in the HR office than on

the production floor.  (Doc. No. 77-12, Bowen Decl. ¶ 15; Doc. No. 77-20, Phillips-Velez Decl.

¶¶ 16-19).  In addition, Birchfield frequently asked Bowen, Phillips-Velez, and Melton about

Vinson and whether she was working on the production floor.  (Doc. No. 77-12, Bowen Decl.

¶ 15; Doc. No. 77-20, Phillips-Velez Decl. ¶¶ 18-20; Doc. No. 77-17, Melton Decl. ¶ 11).

According to Vinson, some situations required her to go to the HR office, such as making a report

related to training a production floor employee, training Phillips-Velez as an Orientation Trainer, or filling in for absent HR employees.  (Doc. No. 115-5, Vinson Decl. ¶ 19).

On May 17, 2012, Melton, at the direction of Birchfield, terminated Vinson.  Melton explained to Vinson "that her position was not producing sufficient feedback and productivity thus, the decision had been made to eliminate the position, terminating her employment."  (Doc. No. 116-15, Email from M. Melton, May 17, 2012).  On June 20, 2012, Vinson filed a Charge of Discrimination with the Equal Employment Opportunity Commission, ("EEOC").  (Doc. No. 118-10, EEOC Charge of Discrimination).  In a statement to the EEOC, Birchfield stated the following reason as to why he eliminated Vinson's position:

> In a discussion with the plant manager, Johnny Gill, on the morning of May 17, 2012, he informed me that he felt [Vinson] was not doing her job, and that having a trainer that sits in the HR office all of the time was not something the company could afford to continue to do, and wanted the position eliminated.

(Doc. No. 116-14, Letter from Koch Foods to EEOC, Aug. 7, 2012).  Johnny Gill, the plant manager at the kill facility, testified that he asked Birchfield about Vinson's responsibilities and duties, but did not recommend that Birchfield terminate Vinson.  (Doc. No. 115-3, Gill Dep. 51:3-5; 52:17-54:3, Sept. 23, 2015).  Otherwise, Gill did not recall his conversation with Birchfield.  (*Id.* at 53:4-54:4).

At the time Birchfield terminated Vinson, three positions were open in the HR department.  (Doc. No. 116-24, Email from D. Birchfield, May 18, 2012).  According to Birchfield, Vinson was not qualified for an HR clerk's job.  (Doc. No. 77-9, Birchfield Dep. 161:7-162:1).  Since Vinson's termination, Koch has not hired anyone to perform Vinson's role on the production floor.  (Doc. No. 77-1, Vinson Dep. 255:22-256:2).

### C. Procedural Background

On December 14, 2012, Vinson initiated this action, asserting the following claims: race discrimination pursuant to 42 U.S.C. § 1981, (Count I); national origin discrimination pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, as amended, (Count II); gender discrimination pursuant to Title VII, (Count III); and several state law claims, (Counts IV-VI).  (Doc. No. 1).  This case was originally assigned to District Court Judge Mark E. Fuller, and on September 27, 2013, Judge Fuller granted Defendants' Motion to Dismiss Counts III-VI, and Counts I and II to the extent that they were based on discriminatory pay, failure to promote to any position other than the PTD and night HR manager positions, and retaliation.  (Doc. No. 13, at 24-25).  The Court, however, granted leave for Vinson to file an amended complaint as to her § 1981 claim only.  (*Id.*).

Accordingly, Vinson filed an Amended Complaint on October 14, 2013 that added Birchfield as a defendant and alleged additional facts addressing promotions, discriminatory pay, and retaliation.  (Doc. No. 16).  In response, Defendants filed a Motion to Dismiss.  (Doc. No. 18).  On June 10, 2014, the Court granted in part and denied in part Defendants' Motion to Dismiss.  (Doc. No. 25).  Consequently, Defendants Koch and Birchfield now move for summary judgment on Plaintiff's § 1981 and Title VII claims that allege discriminatory pay, promotion, discipline, and termination.  (Doc. No. 75).  Plaintiff opposes Defendants' Motion.  (Doc. No. 119).[5]

---

[5]  Prior to filing her response to Defendants' Motion for Summary Judgment, Plaintiff filed a Motion to Exclude Defendants' Witness Declarations or, in the Alternative, for Additional Discovery on December 14, 2015.  (Doc. No. 91).  Magistrate Judge Susan Russ Walker granted Plaintiff's Motion, permitting Plaintiff to depose witnesses Blackmon, Bowen, Melton, Elrod, and Philips-Velez, and thereafter supplement her response to Defendants' Motion for Summary Judgment.  (Doc. No. 120).  Defendants appealed Magistrate Judge Walker's Order on December 31, 2015.  (Doc. No. 123).  As a result, the Court stayed the case in its entirety on January 8, 2016.  (Doc. No. 137).  While stayed, the matter was transferred to the Honorable Judge Barbara J. Rothstein on June 23, 2016.  (Doc. No. 155).  Once transferred, and after holding a status conference, this Court permitted Plaintiff to supplement her summary judgment briefing and Defendants to reply fourteen days thereafter.  (Doc. No. 159).

### III.    LEGAL STANDARDS

*A.  Legal Standard for Summary Judgment*

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (internal quotation marks omitted).  A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In resolving summary judgment, the Court must "'view the evidence and all factual inferences therefrom in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in favor of the non-movant.'" *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)).

*B.  Legal Standards for Plaintiff's Title VII and § 1981 Discrimination Claims*

As mentioned above, Plaintiff asserts discriminatory pay, promotion, discipline and termination claims under Title VII and § 1981.  Title VII's anti-discrimination statute makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Similarly, § 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  42 U.S.C. § 1981(a).  Importantly, Title VII and § 1981 "have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Servs.,*

*Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Accordingly, the Court will use the same standards to evaluate Plaintiff's discrimination claims.

Discrimination claims can be categorized as single-motive or mixed-motive claims. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 n.4 (11th Cir. 2016) ("Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action."). Single-motive claims, known as "pretext" claims, "require a showing that bias was the true reason for the adverse action." *Id.* The Eleventh Circuit utilizes the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate single-motive discrimination claims. *See id.*, 814 F.3d at 1238 n.7. The *McDonnell Douglas* framework proceeds as follows:

> The plaintiff must first create an inference of discrimination through his prima facie case. Once the plaintiff has made out the elements of the prima facie case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action. If the employer meets this burden, the inference of discrimination drops out of the case entirely, and the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons were pretextual. Where the plaintiff succeeds in discrediting the employer's proffered reasons, the trier of fact may conclude that the employer intentionally discriminated.

*Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767-68 (11th Cir. 2005) (per curiam) (citations omitted).

In contrast, a mixed-motive claim serves as a different theory of discrimination. *See Quigg*, 814 F.3d at 1235 n.4. Specifically, an "employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, was a motivating factor for an adverse employment action, even though other factors also motivated the action." *Id.* at 1235 (internal quotation marks omitted). The Supreme Court established this theory—that an adverse employment action motivated by both legal and illegal reasons constitutes actionable

11

discrimination under Title VII—for the first time in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  Two years after *Price* Waterhouse, Congress amended Title VII, setting forth standards applicable to mixed motive cases.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).  The first of two new statutory amendments provides the following:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motived the practice.

42 U.S.C. § 2000e-2(m).  The second amendment provides that the available remedies on a mixed-motive discrimination claim are limited to declaratory relief, types of injunctive relief, and attorney's fees and costs.  § 2000e-5(g)(2)(B).  After the passage of the 1991 Amendments, the Court held that an employee can prove a mixed-motive case with direct or circumstantial evidence. *Desert Palace*, 539 U.S. at 101-02.  The Court, however, did not resolve the question of whether the burden shifting regime articulated in *McDonnell Douglas* was the appropriate framework to resolve mixed-motive claims at the summary judgment stage.  *Id.* at 92.

In *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016), the Eleventh Circuit resolved that question, holding that the *McDonnell Douglas* framework is improper to evaluate mixed-motive discrimination claims at the summary judgment stage.  *Id.* at 1238.  Instead, the Eleventh Circuit adopted the framework set forth in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008).  *Id.* at 1239.  "That framework requires a court to ask only whether a plaintiff has offered 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action.'"  *Id.* (quoting *White*, 533 F.3d at 400).

Plaintiff Vinson asserts her discriminatory pay, promotion, and discipline claims under a single-motive theory, and her discriminatory termination claim under a mixed-motive theory.

(Doc. No. 119).  The Court therefore applies the *McDonnell Douglas* framework to Plaintiff's discriminatory pay, promotion, and discipline claims, and the *Quigg* framework to Plaintiff's discriminatory termination claim.

## IV.   DISCUSSION

### A.  *Plaintiff's Discriminatory Pay Claim*

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage."  *Cooper v. Southern Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004), *overruled on other grounds Ash v. Tysons Foods, Inc.*, 546 U.S. 454 (2006).

Defendants argue that Plaintiff fails to establish a prima facie case of discriminatory pay because Plaintiff does not satisfy the third element.  (Doc. No. 76, at 27-28).  Specifically, Plaintiff fails to proffer evidence of comparators—individuals who shared the same type of tasks as Plaintiff—outside her protected class who received higher compensation.  For example, Plaintiff testified that her pay claim is based upon a white employee who held a Supply Clerk position in or around 2010.  (Doc. No. 77-1, Vinson Dep. 231:9-239:9).  However, Defendants point out that Plaintiff also stated that her position as an Orientation Trainer was "completely different" than that of a Supply Clerk.  (*Id.* at 237:20-238:17).  Plaintiff does not respond to Defendants' arguments.[6]

"In a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him."  *MacPherson v. Univ. of*

---

[6]      In Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Plaintiff fails to address her discriminatory pay claim in its entirety.  (Doc. No. 119).  While the Court is permitted to treat Plaintiff's discriminatory pay claim as abandoned, *see, e.g.*, *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994), the Court resolves Plaintiff's claim on the merits.

*Montevallo*, 922 F.2d 766, 774 n.16 (11th Cir. 1991). In the instant action, the Court cannot engage in a comparator analysis because Plaintiff fails to proffer any evidence of similarly situated comparators outside Plaintiff's protected class who received higher compensation. In failing to do so, Plaintiff does not establish a prima facie case for discriminatory pay. The Court GRANTS Defendants' Motion for Summary Judgment with respect to Plaintiff's discriminatory pay claim.

### B. *Plaintiff's Discriminatory Promotion Claims*

#### 1.   2011 PTD Position

Plaintiff alleges Defendants discriminated against her when they selected Johnson for the PTD position in 2011. Particularly, Plaintiff argues that she was not selected for this promotion because of her race and national origin. (Doc. No. 119, at 51). In the absence of direct evidence of discrimination, the Court proceeds with the *McDonnell Douglas* analysis articulated above. A plaintiff must establish a prima facie case to prevail on a discriminatory promotion claim. Plaintiff must demonstrate that: (1) she belongs to a protected class; (2) she was qualified for and applied for a position the employer was looking to fill; (3) despite qualifications, she was rejected; and (4) the position was filled with an individual outside the protected class. *Vessels*, 408 F.3d at 768.

In the instant action, the parties dispute whether Plaintiff is qualified for the PTD position.[7] To demonstrate that one is qualified for a position, a plaintiff "need only show that he or she satisfied an employer's *objective* qualifications." *Id.* at 769 (emphasis added). For example, courts "have focused on plaintiffs' skills and background to determine if they were qualified for a

---

[7]     Defendants additionally argue that Plaintiff cannot establish that she was a member of a protected class because "she admits she was born in and has spent most of her life in the continental U.S." (Doc. No. 76, at 18 n.6.). As noted by Plaintiff, the Court in *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973), explained that "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." Plaintiff's parents are Puerto Rican. (Doc. No. 77-1, Vinson Dep. 257:11-12). The Court therefore concludes that Plaintiff has satisfied that she is a member of a protected class.

particular position." *See, e.g.*, *Clark v. Coats & Clerk, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993).

The PTD position listed, among others, the following requirements:

> Bachelor's or Master's degree in Business Administration and Management, Human Resources, Industrial/Organizational Psychology, or other related field. A minimum of 2 years work experience is required. Employer will consider advance degrees in lieu of experience.

(Doc. No. 77-10, PTD Job Description). Defendants argue that Plaintiff fails to establish a prima facie case because she did not have the requisite education level for the PTD position at the time she applied. (Doc. No. 76, at 32). Plaintiff concedes, yet contends that Defendants "did not consider possession of a Bachelor's degree a necessary qualification for this position," as evidenced by Defendants' later promotion of Melton, a Koch employee who did not have a Bachelor's degree, to the PTD position in 2012. (Doc. No. 119, at 54-55). Assuming that Plaintiff establishes a prima facie case, however, Plaintiff's discriminatory promotion claim still fails. For the reasons stated below, Plaintiff cannot show that Defendants' proffered reasons for selecting Johnson are pretextual.

Having assumed that Plaintiff has established a prima facie case, Defendants may rebut the presumption of discrimination by advancing legitimate, non-discriminatory reasons for its decision. *Standard*, 161 F.3d at 1331. "This is a burden of production, not persuasion." *Id.* Consequently, the burden is "exceedingly light." *Vessels*, 408 F.3d at 770 (internal quotation marks omitted). "So long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production." *Id.* (internal quotation marks omitted). When rebutting a prima facie case for discriminatory failure to promote, the following is required:

A defendant may not merely state that the employment decision was based on the hiring of the 'best qualified' applicant, but must articulate specific reasons for that applicant's qualifications such as 'seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination' of such criteria.

*Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003) (quoting *Increase Minority Participation by Affirmative Change Today (IMPACT) v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990)).   In this case, Defendants assert the following reasons for its selection of Johnson: (1) Johnson's demonstrated ability to problem solve, and her originality and ambition in creating a new position; (2) Johnson's education and training as the only candidate with a Bachelor's degree; (3) Johnson's internship experience; and (4) Johnson's interpersonal skills, including her professionalism and likeable personality.  (Doc. No. 76, at 35-36).   These detailed reasons are sufficient to allow a rational fact finder to conclude that Defendants' selection of Johnson, and not Plaintiff, was non-discriminatory.

Faced with these legitimate, non-discriminatory reasons, Plaintiff must show that they are pretextual.  A plaintiff may establish pretext by revealing "such weaknesses, implausibilities, inconsistences, or contradictions in [Defendants'] proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." *Cooper*, 390 F.3d at 725.  "[A] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)) (internal quotation marks omitted) (emphasis in original).  Plaintiff argues that Defendants' proffered reasons are pretextual because they preselected Johnson.  (Doc. No. 119, at 56).

Plaintiff's argument is not persuasive.  The Eleventh Circuit has held that "even where preselection violates corporate personnel policies, it does not necessarily indicate racial

16

discrimination." *Springer*, 509 F.3d at 1350; *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) ("[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer.") (internal quotation marks omitted). Accordingly, Plaintiff has failed to present evidence sufficient to allow a rational fact finder to conclude that the legitimate, non-discriminatory reasons advanced by Defendants are "unworthy of credence." The Court therefore GRANTS Defendants' Motion for Summary Judgment with respect to Plaintiff's claim that Defendants discriminated against her when they selected Johnson for the PTD position in 2011.

2.     2012 PTD Position

Plaintiff alleges Defendants discriminated against her a second time when they selected Melton for the PTD position in 2012. (Doc. No. 119, at 57). In utilizing the same *McDonnell Douglas* framework, the Court first reviews Plaintiff's prima facie case.

Defendants first argue that Plaintiff fails to show that she applied for the PTD position in 2012. Specifically, Defendants adduce evidence that Plaintiff could not recall whether Defendants posted the position. (Doc. No. 76, at 29-31 (quoting Doc. No 77-1, Vinson Dep. 217:1-218:2; 282:7-283:11)). Defendants also adduce evidence that Plaintiff knew the position was open but did not apply for it or express any interest to anyone. (*Id.*). Plaintiff concedes, but argues that she "need not establish that she applied for a position if it was not posted and Defendants had reason to know of her interest in the position." (Doc. No. 119, at 58).

Defendants next argue that Plaintiff does not establish a prima facie case because she fails to show that she was qualified for the position. Defendants explain that Koch employees who had been formally disciplined within the preceding six months were ineligible for promotions. (Doc.

No. 76, at 31). Given that Plaintiff was suspended in January 2012, Defendants argue, Plaintiff was ineligible for the PTD position that was filled in April 2012. (*Id.*). Plaintiff counters, arguing that the record shows that Defendants inconsistently follow its suspension/promotion policy. (Doc. No. 119, at 59).

The Court, however, need not resolve the parties' disputes regarding Plaintiff's prima facie case. Assuming again that Plaintiff establishes a prima facie case, Plaintiff's discriminatory promotion claim still fails. For the reasons stated below, Plaintiff cannot show that Defendants' proffered reasons for selecting Melton are pretextual.

In efforts to rebut Plaintiff's prima facie case, Defendants advance legitimate, non-discriminatory reasons for selecting Melton. (Doc. No. 76, at 37). They include the following: (1) Melton's "extensive experience in management and in creating and implementing training programs;" (2) Melton's prior experience developing and implementing a company-wide safety training program; and (3) Melton's professionalism. (*Id.*). These reasons satisfy Defendants' exceedingly light burden at this juncture of the *McDonnell Douglas* framework.

Once defendants present legitimate, non-discriminatory reasons, a plaintiff must show that they are pretextual. In her Supplemental Response to Defendants' Motions for Summary Judgment, Plaintiff argues that Defendants' reasons are pretextual for the following reasons: (1) The PTD job description stated, "Bilingual. English/Spanish Preferred,"[8] yet Melton is not bilingual; (2) Melton testified that his experience at a sales company from 2002 until 2004 did not include HR duties, disciplinary authority or training authority; (3) Melton testified that his only experience in the development of training programs occurred when he was employed by

---

[8] Plaintiff refers the Court to Exhibit J, (Doc. No. 115-10), to support this assertion. (Doc. No. 171, at 4). That exhibit is a compilation of open positions and their respective descriptions, including the PTD position. Based on the Court's review, the PTD job description does not state "Bilingual. English/Spanish Preferred."

Goldston's Building Supply from 1990 until 1996; and (4) Melton worked as a personal fitness trainer from 2004 until 2009.  (Doc. No. 171, at 4).

Plaintiff's attempts to discredit Defendants' legitimate, non-discriminatory reasons are unavailing.  In arguing that Melton's experience with HR responsibilities is too remote, Plaintiff ignores the record in this case.  As demonstrated by his resume, Melton worked in HR at Koch for two years prior to his selection for the PTD position.   (Doc. No. 116-4, Melton's Resume). Additionally, in attempting to minimize Melton's qualifications, the Court understands Plaintiff to be arguing that she is more qualified than Melton for the PTD position.  The Eleventh Circuit had made it clear that an employee "must adduce evidence that the disparity in qualifications is 'so apparent as virtually to jump off the page and slap you in the face.'"  *Cooper*, 390 F.3d at 732 (quoting *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001)).  Aside from arguing that she was bilingual and had experience working with a large number of employees,[9] Plaintiff fails to point the Court to additional evidence that shows that she was "so clearly more qualified for the position than [Melton] that a reasonable juror could infer discriminatory intent."  *Id.*

Accordingly, the Court finds that Plaintiff has failed to present evidence sufficient to allow a rational fact finder to conclude that the legitimate, non-discriminatory reasons advanced by Defendants are "unworthy of credence."  The Court therefore GRANTS Defendants' Motion for Summary Judgment with respect to Plaintiff's claim that Defendants discriminated against her when they selected Melton for the PTD position in 2012.

### C.  Plaintiff's Discriminatory Discipline Claim

"[I]n cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a)

---

[9]     Importantly, at the time that the PTD position opened in 2012, neither Plaintiff nor Melton met the educational requirements for the position.  (Doc. No. 77-4, Vinson's Resume; Doc. No. 116-4, Melton's Resume).

that [s]he did not violate the work rule,[10] or (b) that [s]he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against [her] were more severe than those enforced against the other persons who engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). Of course, courts have uniformly read Title VII to require a plaintiff to establish, as part of her prima facie case, that she suffered an adverse employment action. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001) (citing cases).

In support of her prima facie case, Plaintiff contends that the disciplinary measures enforced against her were more severe than those enforced against her Caucasian co-workers. (Doc. No. 119, at 60-63). Plaintiff claims that: (1) Birchfield never contacted Plaintiff to advise her to return to work, yet contacted one of her Caucasian co-workers; (2) once Birchfield contacted Plaintiff, he informed her that he had to discuss her return with the Director of HR; (3) Plaintiff was not advised to return to work on the same day as her Caucasian co-workers; and (4) Birchfield permitted Plaintiff's Caucasian co-workers to return to their HR jobs, yet informed Plaintiff that she would be reassigned to the production floor. (*Id.* at 61-63).

According to Defendants, Plaintiff cannot establish that the disciplinary measures enforced against her were more severe because each employee received the same 3-day unpaid suspension. (Doc. No. 76, at 39-40). Moreover, Defendants argue that Plaintiff fails to establish that she

---

[10]     Plaintiff first argues that she did not violate a work rule. According to Plaintiff, Birchfield "wrote the women up for violating the job abandonment policy" but that policy "applies when an employee fails to come to an assigned shift for three days or fails to notify her supervisor that she is not coming to work." (Doc. No. 119, at 61). The Court need not determine the validity of this claim. "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which [s]he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones*, 874 F.2d at 1540. On this record, it is clear that Defendants "honestly believed" that Plaintiff, along with her two co-workers, violated Koch's policy. (Doc. No. 77-9, Birchfield Dep. 49:8-17). Accordingly, it is of no consequence that Plaintiff disputes the violation giving rise to her suspension.

suffered an adverse employment action, a basic requirement of a Title VII claim.  (Doc. No. 178, at 28-31).  This is so, Defendants argue, for two reasons:  First, Plaintiff received compensation for returning one day later than her co-workers, and second, Plaintiff's reassignment to the production floor was not materially adverse.  (*Id.*).

The Court finds that Plaintiff fails to state a prima facie case for discriminatory discipline because Plaintiff did not suffer an "adverse employment action."  An adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote*,* reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  "[T]he asserted impact [of an employment action] cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."  *Davis*, 245 F.3d at 1239 ("[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances.").

Applying those principles to Plaintiff's four assertions listed above, Defendants' failure to contact Plaintiff and Defendants' need to obtain approval before Plaintiff returned to work are *de minimis*.  *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("Title VII[] is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace.") (internal quotation marks omitted).  Similarly, Defendants' failure to advise Plaintiff to return to work on the same day as her co-workers is not materially adverse because Plaintiff was compensated for that missed time.  As to her fourth assertion, Plaintiff's reassignment did not constitute an adverse employment action for several reasons.  First, Plaintiff's pre-suspension duties did not differ significantly from her post-suspension duties.  The mere fact that Plaintiff was

transferred from the HR office to the production floor does not convert the transfer into an adverse employment action. Second, Plaintiff testified that she did not "mind" being on the production floor. (Doc. No. 77-1, Vinson Dep. 58:5-8). Third, Plaintiff received a raise for completing her training on all production floor duties. (*Id.* at 189:7-11).

Significantly, it is well established that "Title VII is not designed to make federal courts "sit as a super-personnel department that reexamines an entity's business decision." *Davis*, 245 F.3d at 1244 (internal quotation marks omitted). In particular, "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise." *Id.* Accordingly, without more, Plaintiff's discriminatory discipline claim cannot prevail. The Court therefore GRANTS Defendants' Motion for Summary Judgment with respect to Plaintiff's discriminatory discipline claim.

### D.  Plaintiff's Discriminatory Termination Claim

Plaintiff asserts that Defendants unlawfully terminated her. Her allegations evoke a mixed-motive theory.[11] The appropriate framework for examining mixed-motive claims at summary judgment requires a court to determine only whether a plaintiff has offered "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (quoting *White*, 533 F.3d at 400) (emphasis in

---

[11]      The Court recognizes that the Eleventh Circuit issued its decision in *Quigg* after Plaintiff filed her Opposition to Defendants' Motion for Summary Judgment. At the same time, in her Opposition, Plaintiff urged the Court to utilize a motivating factor test, rather than the *McDonnell Douglas* framework. (Doc. No. 119, at 10-25, 66-67). Furthermore, after this action was transferred, this Court provided both parties with an opportunity to supplement their respective summary judgment briefing. While Plaintiff advocated for the appropriate standard and obtained additional time to supplement her position, she fails to apply the motivating factor framework to the record. Instead, Plaintiff argues that Defendants unlawfully terminated her using the burden shifting framework of *McDonnell Douglas*. (Doc. No. 119, at 69-73). Despite Plaintiff's failure to apply the motivating factor framework to her case, the Court will use evidence adduced in Plaintiff's briefs to resolve whether Plaintiff demonstrates evidence sufficient to convince a rationale fact finder that her race and/or national origin was *a* motivating factor in her termination.

original).   Stated differently, a plaintiff can succeed if she demonstrates that "'discriminatory input'" factored into the "'decisional process.'"   *Id.* at 1241 (quoting *Price Waterhouse*, 490 U.S. at 272 (O'Connor, J., concurring)).

Plaintiff contends that Defendants "submitted changing explanations and reasons" for her termination.   (Doc. No. 119, at 71).   First, Defendants state that Birchfield instructed Melton to terminate Vinson because the "position was not producing sufficient feedback and productivity" and "thus, the decision had been made to eliminate the position."   (Doc. No. 116-15, Email from M. Melton, May 17, 2012).   Second, Birchfield stated to the EEOC that Koch's plant manager, Johnny Gill, stated that Plaintiff was not doing her job and that he wanted the position eliminated. (Doc. No. 116-14, Letter from Koch Foods to EEOC, Aug. 7, 2012).   Gill testified that he did not recommend that Birchfield terminate Plaintiff; however, Gill also testified that he does not recall his conversation with Birchfield.   (Doc. No. 115-3, Gill Dep. 51:3-5; 53:4-6).   Third, Birchfield stated that Plaintiff was terminated for lack of work while at the time there were three vacancies in the HR department.

In response, Defendants argue that Plaintiff was terminated because her job duties were eliminated, as articulated by Melton in his email to Birchfield.   (Doc. No. 178, at 26).   With respect to Birchfield's conversation with Gill, Defendants agree that Gill's testimony indicates that he does not remember the specifics of the conversation.   That, however, "does not dispute [that] they discussed the cost of [Plaintiff's] position in relation to the plant budget, or that he told Birchfield that [Plaintiff's] position was not needed in conjunction with workers production training."   (*Id.* at 27 n.11).   Lastly, Defendants deny that Birchfield stated "lack of work" as a reason for Plaintiff's termination; rather, Defendants contend that it was Plaintiff who reported "lack of work" to the Alabama Department of Labor.   (*Id.* at 28, n.12).

Notably absent from the above account of Defendants' reasons for terminating Plaintiff is her race and/or national origin.  In her deposition, Plaintiff testified that Birchfield did not typically acknowledge her presence and, during the conversation after her suspension, Birchfield turned his back to her and tended to emails.  (Doc. No. 77-1, Vinson Dep. 290:20-292:12).  When asked what leads her to believe that Birchfield had a problem with her being from Puerto Rico, Plaintiff testified that "[i]t's not distinguished by many, and from my understanding, what I observed it wasn't – for him it was just overall Hispanics, including the national origin.  It was just an overall dislike for the race, the origin because they were all considered the same."  (*Id.* at 210:21-211:8).

Despite reviewing the record in the light most favorable to Plaintiff, the Court cannot conclude that Plaintiff produces evidence sufficient to convince a rationale fact finder that her race and/or national origin discrimination was *a* motivating factor in Defendants' decision to terminate her.  The Court recognizes that Defendants submit multiple explanations for terminating Plaintiff. What is significant is that Plaintiff can point to nothing that suggests that Plaintiff's race and/or national origin was a motivating factor in her termination.  *See Quigg*, 814 F.3d at 1241 (holding that sex or gender was a motivating factor when board members in charge with deciding whether to rehire plaintiff made sex or gender-based statements during the hiring process).  Moreover, the record does not discredit Defendants' reasons.  Plaintiff's testimony regarding Birchfield's discriminatory animus is not specific enough to convince a rational fact finder that "'discriminatory input'" factored into his "'decisional process.'"  *See Spencer v. EZ Title Pawn, Inc.*, No. 7:14-cv-32 (HL), 2016 WL 1259409, at *14 (M.D. Ga. Mar. 30, 2016) (holding that an employee's "generalized feelings" are not sufficient to permit a reasonable jury to find that an illegal bias played a role in Defendant's termination decision).  Furthermore, Birchfield hired Daisy Phillips-Velez, a Puerto Rican, to assume Plaintiff's responsibilities in the HR office,

24

belying his alleged discriminatory animus toward Hispanics.  (Doc. No. 77-20, Phillips-Velez Decl. ¶ 3).  Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment with respect to Plaintiff's claim for discriminatory termination.

## V.  CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. The Court GRANTS Defendant Koch Foods, LLC's Motion for Summary Judgment, (Doc. No. 73), as unopposed;

2. The Court will not assess tax costs against Plaintiff;

3. The Court GRANTS Defendants Koch Foods of Alabama, LLC, and David Birchfield's Motion for Summary Judgment, (Doc. No. 75), with respect to all claims;

4. The Court DENIES Defendants' Motion for Leave to Supplement its Evidentiary Submission in Support of its Motion for Summary Judgment, (Doc. No. 179), as MOOT; and

5. The Court STRIKES Defendants' Objections to Declarations of Maria Vinson, Patrick Rinn, and Alesia Simmons, (Doc. No. 177), as MOOT.

**IT IS SO ORDERED.**

Dated: November 29, 2016.

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE